2020 IL App (1st) 190066

FIFTH DIVISION
September 4, 2020

No. 1-19-0066

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| MOSES ELIAS, | ) | On Petition for Administrative |
| | ) | Review from the Board of |
| Petitioner, | ) | Education of the City of Chicago |
| | ) | |
| v. | ) | |
| | ) | |
| THE BOARD OF EDUCATION OF THE CITY OF | ) | |
| CHICAGO and JANICE JACKSON, Chief Executive | ) | |
| Officer, | ) | |
| | ) | |
| Respondents. | ) | No. 18-1205-RS4 |

PRESIDING JUSTICE DELORT delivered the judgment of the court
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*: The Board of Education's order to terminate a teacher complied with the applicable law and was not contrary to the manifest weight of the evidence.

¶ 2                                    BACKGROUND

¶ 3    After a hearing, the respondent, the Board of Education of the City of Chicago (Board) dismissed the petitioner, Moses Elias, from his position as a teacher at Lane Technical High School. The Board determined that Elias received an unsatisfactory rating following his remediation period and thus failed to satisfactorily complete his remediation. Elias seeks

administrative review of that decision, arguing that the Board wrongfully terminated him. We affirm the Board's order.

¶ 4                                          FACTS

¶ 5    On August 12, 2015, the Board's chief executive officer approved a charge against Elias, alleging that his teaching performance was unsatisfactory. The Board issued ten specifications relating to its charge: (1) Elias's 2013-2014 summative rating from his evaluator was unsatisfactory; (2) the following school year, he attended or was invited to an orientation session focused, in part, on the teacher evaluation plan; (3) his evaluator selected a qualified consulting teacher to assist him in improving his performance; (4) the evaluator developed a 90-school-day remediation plan after giving Elias and the consulting teacher a chance to provide input into the plan; (5) the evaluator, consulting teacher, and Elias signed the 90-school-day remediation plan; (6) the evaluator conducted a formal mid-point evaluation of Elias's performance using the CPS Framework for Teaching; (7) at or around the mid-point evaluation, Elias met with the evaluator and consulting teacher to discuss his progress; (8) at or around the conclusion of the remediation period, the evaluator conducted a final evaluation of Elias's performance using the CPS Framework for Teaching; (9) based on the evaluator's personal observations and other evidence, the evaluator determined that Elias failed to attain "proficient" or better level of teaching practice; and (10) no further remediation was necessary, rendering Elias subject to dismissal under Section 24A of the Code, 105 ILCS 5/24A1-1 *et seq*. (West 2014) (Code). The charges concluded that Elias was "subject to dismissal due to [his] unsatisfactory teaching performance" and that dismissal "may result in [his] permanent ineligibility for future employment with the Board."

¶ 6    Elias's union requested a hearing on the charge before a mutually selected hearing officer pursuant to section 34-85 of the Code (105 ILCS 5/34-85 (West 2014)). The parties selected Brian Clauss as the hearing officer. Elias filed an answer to the charge denying the Board's allegations and all the underlying specifications. His answer included six affirmative defenses, stating essentially that the Board would be unable to prove the allegations and conclusorily stating, with no factual explanation, that Elias was denied his due process rights.

¶ 7    At the beginning of the hearing, the hearing officer summarized an off-the-record discussion he had with the parties. He identified an "exhibit binder" containing the Board's 22 exhibits. He recited that Elias's counsel had time to review it, had no objection to the foundation of any of the exhibits contained therein, "and that will be the stipulation that he'll enter into." He continued: "of course that does not affect anybody's ability to argue weight, inferences and conclusions that should be drawn from these exhibits, but we won't have to belabor the procedural aspect of the hearing by asking a bunch of foundational questions. So you'll stipulate to the foundation, correct?" Elias's counsel responded, "yes."

¶ 8    The hearing officer then noted that there was a stipulation that there were no procedural defects (in the underlying proceedings) and that the remediation case was procedurally sound. Both attorneys so stipulated. As the hearing officer eventually issued an exceptionally detailed written summary of the testimony and evidence he heard, we summarize only the testimony and evidence most relevant to the issues which Elias raises on administrative review.

¶ 9    Amanda Smith testified that she is a project manager for performance improvement for the Board. At the beginning of her testimony, she was asked to identify Exhibit 5 from the exhibit binder, which was a "framework for teaching with critical attributes" used to evaluate

teachers under the REACH[1] program. Referring to this exhibit, she explained that employees who evaluate teachers must be state-certified. Teachers are evaluated using a rubric with four "domains": (1) planning and preparation; (2) classroom environment; (3) instruction; and (4) professional responsibility. At the conclusion of her explanation of this exhibit, the Board's attorney asked to admit Exhibit 5 into evidence. The hearing officer declined to do so, stating, "We do that all at the end".

¶ 10    Smith testified that Elias did not file a grievance regarding his employee reviews. She identified Elias's signature on a sign-in sheet for a REACH training session he attended. She explained that, based on her review of various exhibits, Elias was observed in the classroom during the 2013-2014 school year and attended a pre-observation conference on October 4, 2013. Following that school year's evaluations, he received a score of 196.8, which was in the "unsatisfactory" range on a scale where 210 was "developing" and 285 was "proficient". She identified a letter notifying Elias that he was being placed in a remediation status based on his unsatisfactory rating.

¶ 11    During remediation, she explained, teachers must receive coaching from a consulting educator who develops a 90-school-day remediation plan with the teacher. Elias's consultant was Thomas Scanlan[2], a certified middle- and high-school mathematics teacher. Following the remediation period, Elias received a score of 186, again in the unsatisfactory range.

¶ 12    Christine Gonzales testified that she worked for the Board from 2007-2016 in successively more responsible capacities, the last of which was assistant principal at Lane. She is a mathematics specialist with two master's degrees. She was the head of the mathematics department at Lane during Elias's tenure there. Although she had done REACH evaluations, she

---

[1] The term stands for "Recognizing Educators Advancing Chicago's Students".

[2] Scanlan's name is spelled "Scanlon" in certain places in the record, but we use the spelling set forth on his Illinois State Board of Education certificate of credentials, which was an exhibit below.

did not do the REACH evaluation of Elias. Her testimony focused on deficiencies which she observed in Elias's teaching performance which had occurred before his remediation period. Elias's attorney objected to this line of testimony, arguing that was irrelevant to the issue before the hearing officer. Clauss overruled the objection in part, holding that the information could be admitted as "limited purpose it shows the course of her duties and her interactions with Mr. Elias, background about their interaction" but not for "any substance of the reason we're here today".

¶ 13    Dr. Christopher Dignam testified that he is superintendent of a school district in Highland Park, Illinois. Before taking that position, he was the principal of Lane and had supervised the mathematics staff in his earlier position of assistant principal. Among other credentials, he holds master's degrees in curriculum and instruction, and in school leadership administration. He also has a doctorate in teacher leadership and holds an Illinois state superintendent's certificate. He is a trained REACH evaluator whose work had been tested for accuracy and lack of subjectivity through a "calibration" process under which two evaluators evaluate the same teacher and then compare their scores for consistency within specified ranges. He testified that he appointed Scanlan, who had a background in mathematics education, as Elias's consulting teacher. Elias, Scanlan, and Dignam developed Elias's remediation plan together. Dignam was Elias's remediation rater. Dignam explained that the remediation process is interactive, in that the teacher is provided ample opportunities during the remediation period to submit evidence and pedagogical materials showing his teaching skills to the rater.

¶ 14    Dignam reviewed the history of Elias's remediation process, which included a pre-observation conference, classroom observation, and a post-observation conference. He identified exhibits containing his notes regarding Elias's teaching during the remediation period and his

assigned scores on each domain of the REACH rubric, which he explained in detail. In summary, Dignam found that while Elias showed a basic understanding of course material, pedagogy and lesson preparation, he did not show a level of mastery above that basic level. Dignam took particular issue with Elias's failure to engage individual students based on their particular needs, rather than addressing the class as a whole. As evidence, Dignam stated that students walked in late without being called out for doing so, Elias having "no connection, explanation or purpose of an audible video" played in class, students speaking and Elias speaking over the students without addressing the interrupting students, students talking loudly during a quiz, and Elias ignoring a student who failed to answer when called on. Dignam stated that Elias "consistently struggled in a couple of areas," one of which "was the managing student behavior, which also lends to the culture of the classroom. Another was the active engagement with the students—for example, "10 out of 18 students watching a video. The other 8 are doing something else other than that." Further, Dignam stated that Elias exhibited no leadership in communicating with families.

¶ 15    Dignam provided Elias with an opportunity to offer evidence regarding his pedagogical improvement at various points during the remediation process, but he did not do so. At the conclusion of the remediation period, Dignam gave Elias a final score of 186, unsatisfactory. Dignam explained that he has done about 30 teacher observations. Of those, 3 teachers were put into REACH remediation, and Elias was the only one who failed to successfully complete it.

¶ 16    Dignam also explained his progressive evaluation of Elias during the interactive remediation period, stating "I clearly remember Mr. Elias not taking recommendations that were being made when I had provided those either first or second, really the second one is really a big one for that year, of recommendations that would improve professional practice. *** A lot of

work goes into pre-planning for Domain 1 and a lot of work you can see goes into Domains 2 and 3 with the notes that we were taking and sharing the evidence before we even meet for Domain 4. I did not see an adjustment from his performance or instructional capacity from, you know, if you say a progression, I did not see a progression. I did not believe it was close to proficient."

¶ 17    On November 19, 2014, Elias, Scanlan, and the principal signed a three-page remediation plan which specified that Elias should, among other things, improve his student management skills, read a particular publication on teaching improvement and "reflect on themes to inform practice". The plan, signed by Elias, states that his remediation will be governed by the score given by Dignam at the conclusion of the 90-school-day period, using the REACH computation methodology. On February 24, 2015, Dignam scored Elias following a mid-point evaluation.

¶ 18    Elias testified that he has a bachelor's degree from Southern Illinois University which he obtained while in military service, and a master's degree in industrial engineering. He currently works in the manufacturing industry but enjoyed teaching and would like to return to the classroom. He is a nationally board certified teacher but does not have training or credentials in REACH assessment. He claimed he had not seen some of the exhibits reviewed by the Board's witnesses but admitted to having received and offering input for the remediation plan. He believed that since he complied with the Scanlan's suggestions regarding his teaching style, there was "no way" he could have received an unsatisfactory score following his remediation period. He persistently indicated that he "disagreed" with evaluation comments about his teaching style and attention to individual student needs. When asked why he should not have been rated unsatisfactory, he pointed to his academic and professional credentials. He admitted agreeing to be evaluated teaching a "difficult" pre-calculus class. He testified he did not have disagreements

with his consulting teacher and received all the conferences required as part of the remediation process. He also could not dispute that certain factual events which occurred in class occurred as Dignam noted them.

¶ 19    At the conclusion of Elias's testimony, the hearing adjourned. At no point did the attorney for either side formally request admission of the exhibits into evidence. Both sides filed post-hearing briefs.

¶ 20    On October 16, 2018, the hearing officer issued a 25-page order containing written findings of fact, analysis of the applicable law, and a determination that the Board proved that Elias did not successfully remediate. The order contains numerous references to the exhibits, and it relies on them extensively, without commenting on their lack of formal admission on the record.

¶ 21    In summary, the hearing officer noted that Dignam's criticisms followed common themes: lack of connection with students, guiding the class with little student interaction, and providing few opportunities for students to demonstrate reasoning and learning. The hearing officer also found that all of the entries in the pertinent exhibits supported Dignam's assessment of Elias; that the "Comments and Recommendations sections are replete with narrative on why Respondent failed to achieve a Proficient rating"; that Elias "could not transform [his] knowledge into teaching that met the criteria for a Proficient rating"; that Elias was "unable to deliver instruction that rose to the level of Proficient at the end of the remediation period"; and that there were no procedural infirmities that voided the remediation plan. Elias was provided an opportunity to file exceptions to the hearing officer's report. He did not do so.

¶ 22    On December 5, 2018, the Board adopted a resolution terminating Elias from his employment. The resolution recited that the Board had considered Clauss's findings of fact,

conclusions of law, and recommendation; the record; and the parties' post-hearing briefs. The resolution further stated that the Board accepted Clauss's "findings of fact and legal conclusions and accepts the Hearing Officer's recommendation for discharge of Mr. Elias." This petition for direct administrative review followed.

¶ 23                                      ANALYSIS

¶ 24    Section 24A-5(m) of the Code (105 ILCS 5/24A-5(m) (West 2014)) provides that the Board may terminate a teacher who "fails to complete any applicable remediation plan with a rating equal to or better than a 'satisfactory' or 'proficient' rating." Section 34-85(a)(8) of the Code (105 ILCS 5/34-85(a)(8) (West 2014)) provides that a public schoolteacher dismissed by the Board may seek direct review in this court "in accordance with the Administrative Review Law" (735 ILCS 5/3-101 *et seq.* (West 2014)). The standard for judicial review of administrative decisions, such as the one at issue here, is well established. We do not review the decision of the hearing officer, but instead review the decision of the Board. *Ahmad v. Board of Education of the City of Chicago*, 365 Ill. App. 3d 155, 162 (2006); *Hearne v. Chicago School Reform Board of Trustees of the Board of Education for the City of Chicago*, 322 Ill. App. 3d 467, 478 (2001). We consider all issues of law and fact presented by the record. *Speed District 802 v. Warning*, 242 Ill. 2d 92, 111 (2011).

¶ 25    As a reviewing court, we may not interfere with the Board's discretionary authority, but may only review its decision to determine if it is against the manifest weight of the evidence. *Raitzik v. Board of Education of the City of Chicago*, 356 Ill. App. 3d 813, 823 (2005). The Board's findings on questions of fact are deemed *prima facie* true and correct (*Speed District 802*, 242 Ill. 2d at 111-12), and this court does not reweigh the evidence, make credibility determinations, or resolve disputes in testimony or evidence. See *Abrahamson v. Department of*

9

*Professional Regulation*, 153 Ill. 2d 76, 88 (1992). The Board's determination is against the manifest weight of the evidence only if the opposite conclusion is clearly evident, or, stated another way, if "all reasonable and unbiased persons, acting within the limits prescribed by the law and drawing all inferences in support of the finding, would agree that the finding is erroneous." *Raitzik*, 356 Ill. App. 3d at 824 (citing *Daniels v. Police Board*, 37 Ill. App. 3d 1018, 1023 (1976)).

¶ 26    We first address Elias's argument regarding the lack of evidence that he failed to successfully remediate. As noted above, Elias stipulated there were no procedural defects in the remediation process. There was uncontroverted evidence that Elias participated in the required pre-observation conference, observation and post-observation conference, and that Elias received an unsatisfactory score at the conclusion of his remediation evaluation.

¶ 27    Elias contends that the remediation violated section 24A-5(k) of the Code (105 ILCS 5/24A-5(k) (West 2014)). That section provides that a remediation plan must include, in pertinent part:

> "(k) a mid-point and final evaluation by an evaluator during and at the end of the remediation period *** [which] shall *assess the teacher's performance during the time period since the prior evaluation*; provided that the last evaluation shall also include an overall evaluation of the teacher's performance during the remediation period. A written copy of the evaluations and ratings, in which any deficiencies in performance and recommendations for correction are identified, shall be provided to and discussed with the teacher within 10 school days after the date of the evaluation, unless an applicable collective bargaining agreement provides to the contrary. These subsequent evaluations shall be conducted by an evaluator. The consulting teacher shall provide advice to the

teacher rated 'unsatisfactory' on how to improve teaching skills and to successfully complete the remediation plan. The consulting teacher shall participate in developing the remediation plan, but the final decision as to the evaluation shall be done solely by the evaluator, unless an applicable collective bargaining agreement provides to the contrary." (Emphasis added).

¶ 28    Elias's contention of error is grounded in the above-italicized clause, which requires the Board to "assess the teacher's performance during the time period since the prior evaluation". More specifically, he claims that the mid-point and final evaluations were based on single observations, rather than on his overall performance during the span of time preceding each of the two benchmark evaluations. We agree with the Board that the record contains evidence to the contrary. See *supra* ¶ 16. Dignam's notes also show that he considered Elias's work outside the narrow scope of his live classroom observations. Dignam noted that Elias lacked self-reflection, as he did not "provide an accurate assessment of the lesson's effectiveness via evidence or how the lesson could be improved via professional practice"; that he was "very basic" in keeping records; that he communicated with families at a minimal level; and that he had not shown "initiative" or "ownership" in professional growth. Some of these observations are obviously based on information gleaned from outside the classroom observations, presumably from Dignam's interviews and meetings with Elias throughout the remediation process. We therefore do not find that the Board erred by failing to submit sufficient evidence of its compliance with section 24A-5(k) of the Code.

¶ 29    In the same section of his brief, Elias also argues that evidence of his experience and various teaching certifications should have been given some weight in determining whether he successfully remediated. But, as the Board correctly points out, state law gave it the clear

authority to terminate Elias based on the score he received at the conclusion of the remediation process. See 105 ILCS 5/24A-5(m) (West 2014).

¶ 30 Elias next argues that the Board improperly considered material submitted in a post-hearing brief drafted by the Board's prosecuting attorney. He notes that the Board's termination resolution contains a clause stating that the Board considered "post-hearing briefs," which he claims are replete with unfavorable unadmitted evidence of his earlier teaching, which was never admitted into evidence. Some of this material relates to deficiencies in Elias's teaching that occurred before his remediation year, to which Gonzales testified. As noted above, the hearing officer sustained Elias's objection to this testimony, stating that this evidence could be admitted only as background, because the issue before him was, in fact, whether Elias had successfully completed the remediation year, and not his conduct in past years. The hearing officer's report summarizes Gonzales's testimony, but does not comment further on its admissibility. Notably, though, the hearing officer's analysis relies exclusively on the remediation rating process conducted by Dignam. It does not mention Gonzales's testimony regarding Elias's conduct in earlier school years. Even so, reference to post-hearing briefs is a fleeting one, contained in a preamble full of *pro forma* recitals. The actual decretal section of the termination resolution contains no corresponding reference to evidence submitted in post-hearing briefs. It states that the board considered the hearing officer's report, the "record of the dismissal hearing" and "any exceptions and memoranda *of law* submitted by the parties". (Emphasis added). A fair reading of the Board's resolution as a whole, therefore, makes it clear that the Board grounded its decision to terminate Elias solely in the evidence submitted at the hearing. Elias makes the same argument regarding the inclusion of Scanlan's notes in the Board's post-hearing brief, which fails for the same reason.

¶ 31    Elias's final contention of error is that none of the exhibits should have been considered because they were never formally admitted into evidence. But Elias stipulated to their foundation at the beginning of the hearing, and he never filed any exceptions to the hearing officer's report, a report which repeatedly discussed the exhibits as if they had been formally admitted. Section 3-111(b) of the Administrative Review Law (735 ILCS 5/3-111(b) (West 2014) provides:

> "Technical errors in the proceedings before the administrative agency or its failure to observe the technical rules of evidence shall not constitute grounds for the reversal of the administrative decision unless it appears to the court that such error or failure materially affected the rights of any party and resulted in substantial injustice to him or her."

Because Elias was fully aware of the exhibits, stipulated to their foundation, and did not object to their presentation at any time before or after the hearing, and had ample opportunities to challenge their admission, we cannot say that the Board's reliance on them created a "substantial injustice" to Elias.

¶ 32                                 CONCLUSION

¶ 33    For these reasons, we find that the Board's decision that Elias failed to successfully remediate was not against the manifest weight of the evidence and was procedurally sound. The ratings by Dignam were well supported by his recorded observations and not substantially contradicted by Elias's own evidence. We reject Elias's various claims of procedural error and thus affirm the Board's order terminating him from employment as a public schoolteacher.

¶ 34    Affirmed.